ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 09-3016

UNITED STATES OF AMERICA,                              Appellee,

        v.

JAMES BECTON,                                          Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHANNING D. PHILLIPS,
Acting United States Attorney.

ROY W. McLEESE III,
JOHN P. MANNARINO,
ARVIND K. LAL,
MATTHEW P. COHEN,
*   SUZANNE C. NYLAND, DC BAR #375998,
Assistant United States Attorneys.

*   Counsel for Oral Argument

555 Fourth Street, NW, Room 8104
Washington, D.C.  20530
(202) 514-7088

Cr. No. 07-0131(JR)

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee, the United States of America, hereby states as follows:

A. <u>Parties and Amici</u>: The parties to this appeal are appellant, James Becton, and appellee, the United States of America.

B. <u>Rulings Under Review</u>: This is an appeal from the February 5, 2009, judgment of United States District Court Judge James Robertson, in Criminal No. 07-131. Appellant challenges (1) Judge Robertson's September 9, 2009, denial of (a) his motion to suppress evidence intercepted via wiretaps previously authorized by the Honorable Colleen Kolar-Kotelly, and (b) a related request for an evidentiary hearing; (2) the district court's admission of certain evidence and argument during his September 15-24, 2009, jury trial; and (3) the district court's February 11, 2009, order denying appellant's motion for a new trial. There are no official citations to these rulings.

C. <u>Related Cases</u>: Appellee is not aware of any related cases on appeal. In the district court, the following individuals were co-defendants: Willie Best, Russell Ramseur, Keith Sampler, Frederick Mercer, Rubin Butler, Martin Lewis, Miah Jackson, Gina Taylor, Deborah Jones, Michael Fleming, Jaquan Best, Tyrone Washington, Johnny Hodge, Christopher Becton, and Robert Chase.

<u>I N D E X</u>

**PAGE**

COUNTERSTATEMENT OF THE CASE . . . . . . . . . . . . . . . . . 1

    THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Government's Case-In-Chief . . . . . . . . . . . . . . 3

    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.    The District Court Did Not Abuse Its Discretion By
        Denying Appellant's Motion To Suppress Wiretap
        Evidence Or Err In Declining To Hold A <u>Franks</u>
        Hearing . . . . . . . . . . . . . . . . . . . . . . . 14

        A.    Standard of Review and Applicable
            Legal Principles . . . . . . . . . . . . . . . . 14

        B.    Procedural Background . . . . . . . . . . . . 16

            1.    The Wiretap Affidavits . . . . . . . . 16

                a.    The September 27, 2005
                    Mercer Wiretap Affidavit . . . . . . 16

                b.    The October 27, 2005
                    Affidavit In Support Of
                    The Application To Tap
                    Appellant's Cell Phone . . . . . . . 20

                c.    The January 27, 2006 Best
                    Wiretap Affidavit . . . . . . . . . 21

            2.    Appellant's Motion
               to Suppress . . . . . . . . . . . . . . 22

            3.    Appellant's Request For A
               <u>Franks</u> Hearing . . . . . . . . . . . . 23

            4.    The District Court's Ruling . . . . . . 26

        C.    Legal Analysis . . . . . . . . . . . . . . . . 27

ii

1. The Wiretaps' Necessity . . . . . . . . . 27

2. The Franks Hearing Request . . . . . . . 33

II. The District Court Did Not Plainly Err By Admitting Evidence Of Appellant's Continued Participation In The Conspiracy During His 2003-2005 Incarceration . 35

A. Standard of Review . . . . . . . . . . . . . . 35

B. Procedural Background . . . . . . . . . . . . 36

C. Legal Analysis . . . . . . . . . . . . . . . . 40

III. Appellant Did Not Suffer Substantial Prejudice From The Prosecutor's Brief Rebuttal Reference To Appellant's 1995-1999 Incarceration . . . . . . . . 49

A. Procedural Background . . . . . . . . . . . 49

1. Appellant's Motion In Limine . . . . . . 49

2. The Closing Arguments . . . . . . . . . 50

3. Appellant's Motion for a New Trial . . . 53

B. Standard of Review and Applicable Legal Principles . . . . . . . . . . . . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 60

iii

## TABLE OF CASES

PAGE

* <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974) . . . . . 57, 59

* <u>Franks v. Delaware</u>, 438 U.S. 154
    (1978) . . . . . . . . . 12, 14, 15, 16, 23, 27. 33, 34, 35

<u>Gaither v. United States</u>, 413 F.2d 1061
    (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . 55, 59

<u>Illinois v. Gates</u>, 462 U.S. 213 (1983) . . . . . . . . . . 34

<u>Johnson v. United States</u>, 520 U.S. 461 (1997) . . . . . . . . 36

<u>Kotteakos v. United States</u>, 328 U.S. 750 (1946) . . . . . 49, 59

<u>United States v. Alexander</u>, 331 F.3d 116
    (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . 41

<u>United States v. Badru</u>, 97 F.3d 1471
    (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . 42

* <u>United States v. Bowie</u>, 232 F.3d 923
    (D.C. Cir. 2000) . . . . . . . . . . . . . . . 35, 41, 42

<u>United States v. Brantley</u>, 786 F.2d 1322
    (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . 33

<u>United States v. Brown</u>, 823 F.2d 591 (D.C. Cir. 1987) . . . 30

<u>United States v. Brugman</u>, 655 F.2d 540
    (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . 45

<u>United States v. Burnett</u>, 890 F.2d 1233
    (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . 59

<u>United States v. Carrazana</u>, 921 F.2d 1557
    (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . 31

_____

* Cases chiefly relied upon are marked with an asterisk.

iv

\* <u>United States v. Carter</u>, 449 F.3d 1287
    (D.C. Cir. 2006) . . . . . . . . . . . . 14, 27-29, 32-33

<u>United States v. Champion</u>, 813 F.2d 1154
    (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 47

<u>United States v. Childress</u>, 58 F.3d 693
    (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . 55, 59

<u>United States v. Dale</u>, 991 F.2d 819 (D.C. Cir. 1993) . . . 15-16

<u>United States v. Davis</u>, 617 F.2d 677 (D.C. Cir. 1979) . . . . 34

<u>United States v. Donato</u>, 99 F.3d 426 (D.C. Cir. 1996) . . . . 55

<u>United States v. Gartmon</u>, 146 F.3d 1015
    (D.C. Cir. 1998) . . . . . . . . . . . . . . . . 54, 55, 58

\* <u>United States v. Gaston</u>, 357 F.3d 77
    (D.C. Cir. 2004) . . . . . . . . . . . . . . . . 15, 16, 32

\* <u>United States v. Gaviria</u>, 116 F.3d 1498
    (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . 35, 48

<u>United States v. Haire</u>, 371 F.3d 833 (D.C. Cir. 2004) . . . . 41

<u>United States v. Hines</u>, 717 F.2d 1481 (4th Cir. 1983) . . . . 46

<u>United States v. James</u>, 494 F.2d 1007 (D.C. Cir. 1974) . . . 30

<u>United States v. Kahn</u>, 415 U.S. 143 (1974) . . . . . . . . . 27

<u>United States v. Leon</u>, 468 U.S. 897 (1984) . . . . . . . 32, 33

<u>United States v. Lopez</u>, 300 F.3d 46 (1st Cir. 2002) . . . . . 28

<u>United States v. Macklin</u>, 902 F.2d 1320
    (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . 31

<u>United States v. Maddox</u>, 156 F.3d 1280
    (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . 55

<u>United States v. Mathis</u>, 216 F.3d 18 (D.C. Cir. 2000) . . . . 46

v

United States v. McGuire, 307 F.3d 1192
    (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . .  30

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . .  36

United States v. Pindell, 336 F.3d 1049
    (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . .  15

United States v. Plescia, 48 F.3d 1452 (7th Cir. 1995) . . .  30

United States v. Rawlings, 522 F.3d 403
    (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . 36, 48

United States v. Rhodes, 62 F.3d 1449 (D.C. Cir. 1995),
    517 U.S. 1164 (1996) . . . . . . . . . . . . . . . . . .  47

United States v. Richardson, 861 F.2d 291
    (D.C. Cir. 1988) . . . . . . . . . . . . . . . 15, 16, 35

United States v. Ruffin, 40 F.3d 1296 (D.C. Cir. 1994) . . .  47

United States v. Roy, 473 F.3d 1232 (D.C. Cir. 2007) . . . .  58

United States v. Sampol, 636 F.2d 621
    (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . .  46

* United States v. Sobamowo, 892 F.2d 90
    (D.C. Cir. 1989) . . . . . . . . . . . 14, 15, 27, 29, 30

United States v. Tate, 524 F.3d 449 (4th Cir. 2008) . . . . .  35

United States v. Thai, 29 F.3d 785 (2d Cir. 1994) . . . . . .  42

United States v. Wagoner, 713 F.2d 1371
    (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . .  33

United States v. Watson, 171 F.3d 695
    (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . .  55

United States v. Williams (George), 580 F.2d 578
    (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . .  28

United States v. Williams (Salvatore), 124 F.3d 411
    (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . .  31

vi

United States v. Williams (Zolton), 205 F.3d 23
    (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . .  46

United States v. Williford, 764 F.2d 1493
    (11th Cir. 1985) . . . . . . . . . . . . . . . . . .  42

United States v. Young, 470 U.S. 1 (1985) . . . . . . . . . .  57

## OTHER REFERENCES

18 U.S.C. § 1512(c)(2) . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2510 . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 2516 . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 2518(3)(c) . . . . . . . . . . . . . . . . 14, 27

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . 2

21 U.S.C § 841(b)(1)(B) . . . . . . . . . . . . . . . . . . 2

21 U.S.C. § 843(b) . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 860(a) . . . . . . . . . . . . . . . . . . . . 2

Fed. R. App. P. 32(a)(7)(B) . . . . . . . . . . . . . . . 61

Fed. R. Crim. P. 52(b) . . . . . . . . . . . . . . . . . 36

Fed. R. Evid. 103(a) . . . . . . . . . . . . . . . . . . 41

Fed. R. Evid. 103(d) . . . . . . . . . . . . . . . . . . 41

Fed. R. Evid. 105 . . . . . . . . . . . . . . . . . . . . 47

vii

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . 35, 40, 47

Fed. R. Evid. 404(b)  . . . . . . . . 11, 13, 35, 39, 41, 46, 47

22 C. Wright & K. Graham, Jr., Federal Practice and
    Procedure § 5239 (1978)  . . . . . . . . . . . . . . . 41

viii

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee notes that all pertinent statutes and regulations are set forth in the attached Addendum.

ix

## ISSUES PRESENTED

In the opinion of the appellee, the following issues are presented:

I.  Whether the district court (1) abused its discretion by denying appellant's motion to suppress evidence gathered with wiretaps, where traditional law enforcement methods had failed to reveal the full nature and scope of appellant's family-run drug distribution conspiracy, and thus wiretapping was necessary; and (2) erred by denying appellant's request for an evidentiary hearing challenging the veracity of the affidavits submitted in support of the wiretap, where minor details of the extensive criminal histories of two of six confidential informants were omitted by oversight, but were neither material nor omitted intentionally or recklessly, and where they were not critical to the determinations of probable cause and necessity.

II.  Whether the district court plainly erred by admitting, as direct proof of the charged cocaine and marijuana distribution conspiracy, evidence that appellant engaged in drug-dealing while incarcerated from 2003 to 2005 during part of the 13-year time frame covered by the conspiracy, where the evidence showed that appellant was supplied by the same coconspirators, was still directing who should supply a street-level seller, and forged a

x

stronger relationship with a coconspirator who would become a major supplier upon appellant's release from prison.


III. Whether the district court's error in allowing the prosecutor to state, in rebuttal argument, that there was no evidence of appellant's participation in a narcotics conspiracy from 1995 through 1999 because appellant was incarcerated during that period, was harmless, where (1) the evidence against appellant was overwhelming; (2) the remark was made in response to an improper defense argument, and defense counsel had already told the jury in his opening statement that appellant had been imprisoned multiple times; and (3) the jury was instructed that (a) proof of a conspiracy need not cover every year in the charged period, and (b) the arguments of lawyers are not evidence.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 09-3016

UNITED STATES OF AMERICA,                          Appellee,

    v.

JAMES BECTON,                                      Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNTERSTATEMENT OF THE CASE

On October 17, 2007, appellant was charged by a federal grand jury in a superceding indictment with, <u>inter alia</u>, conspiracy to distribute and possess with intent to distribute ("PWID") cocaine, cocaine base, and marijuana between 1995 and May 2007, in violation of 21 U.S.C. § 846 (Count 1) (A. 30-59), and 17 counts of use of a telephone to facilitate the conspiracy, in violation of 21 U.S.C. § 843(b) (Counts 20, 29-31, 40, 47-56, 58, 62) (A. 66, 69-70, 74, 76-82).[1]

_____

[1]     "A." refers to Appellant's Corrected Appendix. "R.M." refers to the Record Material filed herewith.

The superceding indictment also charged appellant with seven additional "telephone" counts, in violation of 21 U.S.C. § 843(b) (Counts 26, 57, 59-61, 63-64) (A. 68, 80-84); distribution of five
(continued...)

2

From September 15-29, 2008, the Honorable James Robertson presided over appellant's jury trial, including six days of testimony and three days of deliberations (A. 19-20). On September 30, 2008, the jury found appellant guilty of conspiracy, and 10 counts of telephone use to facilitate the conspiracy (Counts 20, 29, 47-49, 51-53, 56, and 58) (R.M. 159-60). Appellant was acquitted of the remaining seven telephone counts (Counts 30-31, 40, 50, 54-55, 62) (id.).

On February 5, 2009, the district court sentenced appellant to serve 300 months in prison on Count 1, followed by a 120-month term of supervised release, and concurrent, lesser terms for the 10 telephone use counts, and to pay a $1,100 special assessment (R.M.

---

[1]/(...continued)
grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii) (Count 5) (A. 60); distribution of cocaine within 1000 feet of a school, in violation of 21 U.S.C. § 860(a) (Count 6) (A. 60-61); and obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2) (Count 65) (A. 84). These counts were dismissed before trial.

Nine co-defendants were also named in the superceding indictment (see A. 29-30). Their names, along with those of six additional co-defendants named in the original indictment, are listed in the certificate of compliance and related cases. Appellant and Christopher Becton are the only defendants who have proceeded to trial so far. After the jury acquitted Christopher Becton of PWID cocaine and failed to reach a verdict on the conspiracy count, he pled guilty to conspiracy and was sentenced on February 24, 2009, to 42 months of incarceration. Charges against all but one of the remaining defendants have been resolved through plea agreements and/or dismissals. One defendant, Frederick Mercer, fled the jurisdiction after indictment, but was recently arrested and is now awaiting trial.

3

162-63; A. 430-36). Appellant noted a timely appeal on February 5, 2009 (A. 428-29).

## THE TRIAL

### The Government's Case-In-Chief[2/]

From 2001 through 2005, Christian Donaldson, appellant's sometime girlfriend and the mother of one of his children, sold crack cocaine in the parking lot known as the "second court" outside her apartment building, as well as inside the building, in the 4200 block of 4th Street, S.E., in Washington, D.C. (A. 502, 507-08, 553; R.M. 13, 20).[3/] Appellant regularly provided Donaldson with crack cocaine to sell and showed her how to cut up a 3.5-ounce "eight ball" of crack cocaine into smaller rocks ("dimes") for individual sale (A. 507-09, 514). Donaldson saw appellant "very frequently" make hand-to-hand sales to "crackheads" in another parking lot on Fourth Street known as "the pit" (R.M. 11-12; A. 504-06, 511). Appellant's brother, Willie Best, also sold crack cocaine, but only in larger quantities such as eight-balls,

---

[2/]     Appellant did not present a defense case.

[3/]     In June 2007, Donaldson was arrested and subsequently pled guilty to conspiracy to possess and distribute one kilogram or more of heroin and phencyclidine (PCP) in connection with her participation in a drug ring led by her mother's boyfriend (R.M. 48). Donaldson testified in appellant's trial as part of a plea agreement made in connection with that matter and had not yet been sentenced at the time of trial (R.M. 49-54). As part of the agreement, Donaldson was not charged in connection with her participation in the drug conspiracy in this case (R.M. 51).

4

quarters (7 grams), half ounces, or ounces (A. 511, 514). Appellant himself also sold "weight" (large quantities of cocaine) to other dealers (A. 512).

Donaldson observed appellant gradually assume control of all crack sales made in the "pit" and the second court on Fourth Street by: supplying crack cocaine to all of the sellers there; establishing a seniority-based "rotation" for dealers dictating who would make the next sale; employing recently-incarcerated sellers he had taken under his wing; "slapping" crackheads who did not follow his instructions; and releasing his dog on competing sellers (R.M. 14, 16-21; A. 534). Appellant routinely stored large quantities of crack cocaine in Donaldson's apartment for distribution (A. 514-15).[4/] Donaldson also sometimes held a "little black gun" for appellant (R.M. 22-23). On one occasion, appellant shot a rival dealer, Russell Harris, for refusing to leave the second court (R.M. 24-26, 56; A. 570-71, 573-74).[5/]

---

[4/]    A search warrant executed by the FBI's Safe Streets Task Force on July 27, 2001, resulted in the seizure of 67 grams of crack cocaine from Donaldson's apartment at 4219 4th Street, S.E., that had been provided to Donaldson by appellant so she could deliver it a customer of appellant's known as "Nip" (R.M. 9-10; A. 499, 502, 515-17).

[5/]    Harris testified that appellant shot him in the right leg after accusing Harris of selling drugs in the "second court" (R.M. 56; A. 570-71, 573-74). Appellant was separately tried and acquitted for that shooting (A. 578).

5

Appellant purchased powder cocaine locally from "White Mike" in quantities as large as half a kilogram ("kilo"), or "half a brick" (R.M. 27-28).[6/]    Appellant was shot while attempting to purchase cocaine in Los Angeles for resale in the District of Columbia (R.M. 33-35). Donaldson saw appellant process large quantities of cocaine powder into crack cocaine for sale by mixing it with baking soda and cooking it in a Pyrex pot (R.M. 29-32).

While appellant was incarcerated from October 2003 to Spring 2005, he "was still telling [Donaldson] where to get the work from" so she could continue to "hustle on 4th Street," arranging for her to obtain crack cocaine for sale from a contact known as "Squirt" (Russell Ramseur), one of the sellers to whom appellant had been supplying crack before his incarceration (A. 531-32; R.M. 38, 42-43, 101).  Donaldson also continued to obtain crack cocaine from Fred Mercer, who was supplied and authorized to deal on Fourth Street by appellant (R.M. 19-20, 42-43).  Donaldson "had to keep it on cool grounds . . . with [appellant]" because even from prison, he still "had the ability" to control who was allowed to sell crack cocaine on Fourth Street (R.M. 38).  At first, appellant was held at the D.C. Jail, during which time he asked Donaldson "to bring [appellant] some coke" (R.M. 36, 38).  After appellant was moved to

_____

[6/]    A kilogram of powder cocaine cost between $20,000 and $30,000 (R.M. 29).

6

a federal prison in North Carolina, he asked Donaldson to bring him a cell phone, marijuana, and "a 10 or a 20-pack of dope [heroin]," which appellant planned to sell in prison for $100 a pack instead of the usual street value of $10 (R.M. 36, 38-39).  Appellant instructed Donaldson to obtain the heroin from "Squirt," and Donaldson was "under the impression that [appellant] and Squirt had already talked because when [Donaldson] called Squirt . . . Squirt gave it to [her]" (R.M. 39-40).  Donaldson obtained the marijuana from Keith Sampler (known as "Son" or "Son Son"), another crack dealer on Fourth Street who was supplied by appellant (R.M. 2, 15-16, 41).  Donaldson delivered the cell phone, marijuana, and heroin to appellant in prison with the assistance of a prison guard (R.M. 40-41).

Donaldson moved away after appellant's release from prison in 2005, but upon her return to the District of Columbia in 2007, appellant continued to supply her with crack cocaine to sell (R.M. 42, 44-45).  At that time, several other people were also being supplied by appellant with crack cocaine in large quantities (eight-balls and quarters) for resale (R.M. 47).

In late 2003 or early 2004, Jaquan Best began dealing crack cocaine in the 4200 and 4300 blocks of Fourth Street, S.E. (A. 583-

7

84).[7]   Initially, he obtained his supply from a man named Phil on
Fourth Street, but when Mercer, Jaquan's cousin,[8] told Jaquan that
"all the money need[s] to stay in the family", he began purchasing
quarter- and half-ounce supplies of crack cocaine three or four
times a week from Mercer instead (A. 588-91).   Mercer got his
cocaine from appellant, who "was running the show" (A. 594, 596-
97).[9]

Mercer, appellant's "second" in command, schooled Jaquan in
the rules of "the program," under which sellers were not supposed
to leave the courts or the pit in the Fourth Street area without
first selling all of the cocaine they had so that it would not be
found on them if the police stopped them upon leaving (A. 597;
R.M. 64).   Also, "anything might happen, so . . . you kept a gun
just in case" (R.M. 65).   Sellers were also expected to take turns
making sales in a "rotation" and were permitted to sell crack only
if it had been supplied by someone else "in the program, in the
circle"; cocaine from other sources was not allowed (R.M. 65,

---

[7]     Jaquan Best testified pursuant to a plea agreement under
which he had pled guilty to the charge of conspiring to distribute
and PWID cocaine, and was awaiting sentencing (R.M. 57-62).

[8]     Appellant was also a cousin of Jaquan Best (R.M. 71).

[9]     Appellant and Jaquan also provided each other with
firearms (R.M. 75).

8

69).[10/]    Sellers or buyers of competing sources had their drugs stolen, were "slap[ped] . . . around," or faced appellant's pit bulls, "Juice" and "Rampage," who were released to "bite [them] up" (R.M. 66-67).    Various apartments on Fourth Street were used by people in "the program" to sleep, "stow the dogs," "cut" crack cocaine, or "throw your gun in there or your coke or whatever, if you're going somewhere" (R.M. 73-74).

Gina Taylor, the mother of one of appellant's children, began dating appellant in May or June of 2003 (R.M. 92-94).[11/]    She knew he was a drug dealer and often accompanied him to Fourth Street when appellant stopped there to collect "stacks" of cash (R.M. 94-96; A. 635).    Sometimes, people would bring money to appellant as he sat in his car, or appellant would direct people who owed him money to leave it with a designated person on Fourth Street such as Mercer or Christopher Becton (A. 636-38).

After appellant was jailed in October 2003, he instructed Taylor to collect cash from his associates to pay his attorney's fees (A. 642).    Taylor did so, collecting $2,000 from "White Mike," $1,000 from "Squirt," $1,000 from "Phil," $2,500 from Willie Best,

---

[10/]    On the infrequent occasions when appellant made hand-to-hand sales, "[h]e ain't had to take turns with nobody" (R.M. 64).

[11/]    Pursuant to a plea agreement, Taylor had also pled guilty to conspiracy to distribute and PWID cocaine and was awaiting sentencing at the time she testified at appellant's trial (R.M. 89-92).

9

and additional cash from several others on Fourth Street, between December 2003 and March 2004 (A. 642-46).[12/]  Taylor also set up the voice-mail function on the cell phone that Donaldson had arranged to smuggle to appellant through a prison guard (A. 647-48).

Upon appellant's release from prison in May 2005, Keith Sampler, one of appellant's dealers from Fourth Street, gave appellant a gray Lexus and about $700, and appellant resumed his pre-incarceration routine of going to Fourth Street to collect stacks of cash (R.M. 2, 97; A. 660-61).  Appellant moved in with Taylor and used her apartment to manufacture crack cocaine with Mercer (A. 652-55, 660) and to store gallon-sized Ziploc bags full of marijuana that appellant split up into smaller bags for sale (R.M. 98-99).  Taylor sometimes sold the marijuana herself (R.M. 99).[13/]

Russell Ramseur ("Squirt"), appellant's cousin, had been a drug dealer in Washington, D.C., since 1995, beginning on

---

[12/]  Taylor kept a log listing the names of contributors and the amounts and dates of their contributions (A. 642-46).

[13/]  On May 23, 2006, a search warrant was executed at the District Heights, Maryland, home that Gina Taylor shared with appellant (R.M. 77-78, 87-88; A. 684).  Appellant was not present when the warrant was executed (A. 684).  FBI agents recovered 38.4 grams of cocaine, 125.9 grams of marijuana, a digital scale, a 9mm Luger pistol, ammunition of various calibers, Bureau of Prisons paperwork showing that Mercer had visited appellant while appellant was incarcerated, and other paperwork with appellant's name on it, including his Social Security card (R.M. 79-86).

10

Livingston Road, S.E. (R.M. 109; A. 698).[14/]  In 1999, Ramseur's
fellow Livingston Road dealers began going to the 4200 block of
Fourth Street, S.E., to obtain their supply for sale on Livingston
Road because there was "[a] lot of traffic in and out [of] the
courts" on Fourth Street and cocaine could be purchased for resale
there from Willie Best (A. 698-701).  By 2002, Ramseur and other
Livingston Road dealers had migrated to the 4300 block of Halley
Terrace, S.E., to sell crack cocaine (A. 702).  In 2002 and 2003,
Ramseur saw appellant or Willie Best "[o]n a daily basis" pull up
in a car in the 4300 block of Halley Terrace and supply cocaine to
the dealers there (A. 705).

        In 2003, Gina Taylor asked Ramseur for some money to help
appellant pay his lawyer, and Ramseur gave her "1,000 to 1,500
dollars" (R.M. 110).  Christian Donaldson asked Ramseur to supply
her with heroin and crack cocaine so she could deliver it to
appellant in prison (R.M. 111-12).  After appellant called Ramseur
from custody to confirm that he had made that request, Ramseur
provided Donaldson with cocaine and heroin to deliver to appellant
(R.M. 112-13).

_____

        [14/]    Ramseur had prior convictions for attempted possession of
cocaine, armed robbery, robbery, PWID cocaine, and PWID heroin
(R.M. 102, 104-08).  Pursuant to a plea agreement, he pled guilty
to conspiracy to distribute and PWID cocaine, and was awaiting
sentencing when he testified (R.M. 103-04).

11

By the time appellant was released from prison in 2005, Ramseur was purchasing half-kilos and full kilos of powder cocaine for $12,000 and $22,000 each, respectively, and converting them into crack cocaine (A. 713).  Because Ramseur and appellant's relationship had become "stronger," they "started doing drug transactions together" in which appellant would procure "major weight" (half a kilo or a kilo of powder cocaine) for Ramseur, or vice versa, two or three times a month (R.M. 114-15, 131). Appellant "always [knew] people with major quantities of cocaine," including Willie Best and "Mike" (R.M. 115-16).  Ramseur and appellant often arranged for these transactions using cell phones, employing codes to refer to drugs and quantities (R.M. 116-17).

The jury heard recordings of about 50 cell phone conversations intercepted via wiretaps, many of them involving appellant (see, e.g., R.M. 118-30, 133-53; see also discussion at pp. 16 - 22 infra).

**12**

**SUMMARY OF ARGUMENT**

The district court did not abuse its discretion by denying appellant's motion to suppress evidence obtained from the wiretaps. Wiretaps placed on the cell phones of Fred Mercer, Willie Best, and appellant were supported by affidavits amply demonstrating the necessity for wiretapping following demonstrably limited success using confidential informants, controlled buys, physical surveillance, pen registers, search warrants, grand jury investigation, and other law enforcement techniques that did not yield evidence of the full scope and nature of the family-run drug distribution conspiracy. Appellant also failed to make the requisite threshold showings required to obtain a Franks[15]/ evidentiary hearing on the wiretap affidavits, as he did not show that minor omissions from the criminal histories of two of six confidential informants discussed in one of the affidavits were material, or that they were omitted intentionally or recklessly, or that information provided by those informants was critical to the determination of probable cause or necessity.

The district court also did not plainly err by admitting evidence of appellant's drug-dealing activities while he was incarcerated from 2003 through 2005, as that evidence was direct or

_____

[15]/    **Franks v. Delaware**, 438 U.S. 154, 155-56 (1978) (see discussion at pp. 14 - 16, 23-26, and 33-35 infra).

13

intrinsic evidence of appellant's continued participation in the conspiracy.  Alternatively, it was admissible under Fed. R. Evid. 404(b) to show intent, plan, preparation, and motive.  Even assuming, arguendo, that admission of the evidence was error, appellant is not entitled to reversal because he failed to request a limiting instruction.  In any event, any error in admitting this evidence was not prejudicial given the overwhelming evidence of appellant's guilt.

Finally, although the district court erred by permitting the prosecutor to refer in rebuttal argument to the fact that appellant was also incarcerated between 1995 and 1999, that remark was – as the district court itself found – harmless.  The comment was made to rebut an improper defense argument and, when considered in context, was not prejudicial, especially considering defense counsel's opening statement suggesting that appellant had served multiple prison terms and the admission of evidence of appellant's subsequent period of incarceration.  Further, the jury was properly instructed that, inter alia, the comments of lawyers are not evidence.  Thus, appellant did not suffer substantial prejudice, and reversal is not warranted.

14

## ARGUMENT

I.  **The District Court Did Not Abuse Its Discretion By
    Denying Appellant's Motion To Suppress Wiretap Evidence
    Or Err In Declining To Hold A Franks Hearing**

### A.  Standard of Review and Applicable Legal Principles

Under the federal wiretap authorization statute, a wiretap application must include, <u>inter alia</u>, "'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" <u>United States v. Sobamowo</u>, 892 F.2d 90, 93 (D.C. Cir. 1989) (quoting 18 U.S.C. § 2518(1)(c)). The statute also requires the issuing judge to determine whether an adequate showing of necessity for the wiretap has been made. 18 U.S.C. § 2518(3)(c)). On appeal, that determination is reviewed for abuse of discretion. <u>United States v. Carter</u>, 449 F.3d 1287, 1294-95 (D.C. Cir. 2006); <u>Sobamowo</u>, 892 F.2d at 93.

Courts accord a "presumption of validity" to affidavits submitted in support of search warrants. <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978). Therefore, to obtain an evidentiary hearing on an affidavit's veracity, a defendant must first "make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the

15

allegedly false statement is necessary to the finding of probable cause[.]" Id. at 155-56. The proffer may not be conclusory; it must be accompanied by an offer of proof that "point[s] out specifically the portion of the warrant affidavit that is claimed to be false," and must be supported with "[a]ffidavits or sworn or otherwise reliable statements of witnesses," or a satisfactory explanation for the absence of such support. Id. at 171; see also United States v. Gaston, 357 F.3d 77, 80 (D.C. Cir. 2004) (defendant entitled to evidentiary hearing only if attack on affidavit's accuracy is "accompanied by an offer of proof"). If a defendant establishes that (1) a false statement was made (2) knowingly, intentionally, or recklessly, and (3) the remainder of the affidavit is insufficient to establish probable cause, the warrant must be voided and its fruits suppressed. Franks, 438 U.S. at 155-56; Sobamowo, 892 F.2d at 94 (D.C. Cir. 1989); United States v. Richardson, 861 F.2d 291, 293 (D.C. Cir. 1988).

This Court has not decided what standard of review should apply to the denial of a motion for a Franks hearing.[16/]   See United

---

[16/]    Appellant cites United States v. Pindell, 336 F.3d 1049, 1052 (D.C. Cir. 2003), for the proposition that the Court employs de novo review (Brief for Appellant at 47 n.154).   Pindell involved the denial of a motion to suppress evidence obtained by a warrant, but did not involve a Franks hearing request or discuss the standard of review for one.   Gaston, which did involve a Franks hearing request, cited Pindell for authority that, in reviewing the denial of a motion to suppress, findings of fact are reviewed for
(continued...)

16

States v. Dale, 991 F.2d 819, 843 n.44 (D.C. Cir. 1993) (noting

split among circuits between clear-error and de novo review, and

alluding to prior application of clear-error review to factual

determinations without ultimately deciding standard of review

applicable for Franks hearing) (citing Richardson, 861 F.2d at

293)).

B.    Procedural Background

1.    The Wiretap Affidavits

a.    The September 27, 2005
Mercer Wiretap Affidavit

By 49-page affidavit dated September 27, 2005 (A. 260-308),

FBI Special Agent Mary Counts requested and obtained authority to

place a wiretap on the cell phone of Frederick Mercer who, along

with appellant and at least 17 others, was part of a family-run

drug trafficking ring that had been distributing crack and powder

cocaine in the District of Columbia since 1992 (A. 29, 265, ¶ 9(a);

A. 275-76, ¶ 15).[17/] Appellant and Willie Best were "the leaders of

this enterprise" (A. 269-72, ¶¶ 14(a), (b), (c)).    Mercer was a

_____

[16/](...continued)
clear error and legal conclusions are reviewed de novo.  357 F.3d
at 80.  Without discussing the standard of review for a Franks
hearing, the Court in Gaston also concluded that the district court
was "surely right" to deny that request because the defendant's
challenge to the search warrant affidavit was conclusory and
unsupported by a proffer.  Id.

[17/]    The Honorable Colleen Kollar-Kotelly authorized all three
wiretap requests in this case.

17

"long time member . . . responsible for the distribution of significant quantities of cocaine and cocaine base," and was known to use his cell phone to conduct illegal drug business (A. 276-77, ¶¶ 15-16).

Agent Counts summarized information received about the conspiracy from three confidential sources, two of whom were "presently incarcerated" (A. 277-86, ¶¶ 18-44). "S-1," who had "an extensive criminal history" and was working with the government pursuant to a cooperation agreement, had a "personal relationship with Mercer and Best" and had purchased drugs from "Best and his crew," but reported that Best "would do as few hand-to-hand deals as possible, preferring to sell cocaine wholesale and let other crew members, to include Mercer, sell the smaller . . . rocks of cocaine" (A. 279, ¶ 22). S-2, who was then incarcerated, also had "an extensive criminal history" and a cooperation agreement; had previously "purchased cocaine over the past several years from [Willie] Best and [appellant]," but not from Mercer; had seen Mercer "deliver drugs to buyers on behalf of Best [and] pick up money owed to Best"; and had observed Mercer using his cell phone "to conduct his drug trafficking activities" (A. 283, ¶¶ 34-37). S-3, also possessed of an "extensive criminal history" and a cooperation agreement, advised that appellant and Willie Best had been "supplying crack cocaine in the southeast quadrant of the

18

District of Columbia for a long period of time"; that Best had "transported multiple kilograms of cocaine from North Carolina"; and that Mercer "work[ed] for Best" and had been "asked to step up" while appellant was incarcerated (A. 284-85, ¶¶ 40, 42-44). The affidavit also detailed nine seizures or undercover operations between March 2003 and July 2005 involving Mercer, who since August 2005 had declined to sell crack to undercover police or S-1 (A. 286-91, ¶¶ 45-55).

A wiretap was sought because "[n]ormal investigative procedures have been tried in this investigation and have failed, appear reasonably unlikely to succeed if tried or continued, or are too dangerous to employ" (A. 296, ¶ 69). Specifically, the government had tried surveillance, making controlled purchases using cooperative witnesses and undercover officers, reviewing call data from pen registers, and relying on information from cooperators, but those efforts, while yielding "probative" information, had failed to uncover (1) the identities and roles of all coconspirators, especially those who were supplying and transporting cocaine into the District of Columbia; (2) the methods of supply and quantities involved; (3) the locations where contraband was stored; and (4) the assets generated by the drug trafficking (A. 296-97, ¶ 69).

19

Even if S-1, the unincarcerated cooperator, could make additional controlled buys from Mercer, this would not reveal the full scope of the organization's activities (A. 298, ¶ 70). The potential for undercover operations was limited because the family-run business was "extremely close-knit, involving close associates and family, and [was] very carefully managed, compartmentalized, and operated so as to minimize [Mercer's] contacts with other co-conspirators" (A. 298-99, ¶ 71). The pen register had limited value because coconspirators' telephones were held in the names of girlfriends and other third parties, and the register did not identify the individuals actually making and receiving telephone calls or the nature of those calls (A. 300, ¶ 73).

Physical surveillance helped establish "daily patterns," such as when meetings took place, but criminal activity often occurred inside buildings or vehicles; as a result, surveillance had only "confirm[ed] that some of the identified members of the conspiracy associate[d] with one another," but nothing more (A. 300, ¶ 74). Further, "the topography of the 4200 and 4300 blocks of Fourth Street, SE, ma[d]e[] physical surveillance very difficult" and, if detected, would likely drive coconspirators further underground (A. 300-01, ¶¶ 74-75).

Search warrants were also unlikely to identify the total scope of the operation or the identities of coconspirators (A. 301-02,

20

¶ 76).  On at least three previous occasions, there had been "limited to no evidence recovered" from warrants, and sources later advised that appellant and Willie Best had been forewarned of the warrants and contraband had been moved as a result (A. 301-02, ¶ 76).  Further, numerous family members and associates in apartments on both sides of Fourth Street, S.E., were willing to stash drugs and proceeds, and contraband was routinely rotated to thwart law enforcement (A. 302, ¶ 77).

Grand jury investigation or interviews would simply disclose the fact of an ongoing investigation, leading to more secrecy, evasion, or flight (A. 303, ¶ 78).  One cooperator advised that Willie Best was told by a "little girlfriend" on a grand jury that he was under investigation, and other sources reported that Best "routinely obtain[ed] information regarding potential witnesses against him and his crew" through a correctional officer at the D.C. Jail (A. 304, ¶ 78).

> **b.    The October 27, 2005 Affidavit**
> **In Support Of The Application**
> **To Tap Appellant's Cell Phone**

On October 27, 2005, the government sought authorization to place a wiretap on appellant's cell phone via another affidavit from Agent Counts recounting much of the same information set forth in the Mercer wiretap affidavit (A. 309-68).  She added that S-1 did not purchase drugs directly from appellant because S-1 was a

21

known customer of Willie Best's, and appellant had a "volatile temper" and a "penchant for robbing potential buyers" (A. 331-32, 334, 354, ¶¶ 24, 32, 80).[18/]   The affidavit also summarized communications intercepted by the wiretap on Mercer's phone, including conversations in which appellant, using code terms, referred to various aspects of the drug trade, including drug debts, how drug sales were going, diluting cocaine before selling it, taking orders and arranging deliveries, discussing expenditure of sale proceeds, and treating drug sales as a single enterprise (A. 342-48, ¶¶ 54-68).

c.   The January 27, 2006
Best Wiretap Affidavit

On January 27, 2006, Agent Counts submitted an affidavit in support of an application to tap Willie Best's cell phone (A. 178-243).  The affidavit repeated and expounded information previously reported from S-1, S-2, and S-3 (A. 199-209, ¶¶ 22-50), and added information from three additional confidential sources, S-4, S-5, and S-6, all of whom were incarcerated, had "extensive criminal histories," and were cooperating with the government while awaiting sentencing (in the case of S-6) or in exchange for consideration for a reduced jail sentence in the future (in the cases of S-4 and S-5) (A. 208-10, ¶¶ 51-52, 56-57, 58-59).  S-4 had known appellant

_____

[18/]   Mercer had recently stopped returning S-1's calls, making further purchases from Mercer unlikely (A. 354, ¶ 81).

22

and Willie Best since 1998 and at one time regularly purchased 31
grams of crack cocaine from Best twice a week (A. 209, ¶ 53).  S-
5 had made controlled buys of crack cocaine from Best in 2001, and
S-6 had made two controlled purchases from him in 2002 (A. 210-12,
¶¶ 60-64).  Even so, none of the confidential sources had "full and
complete knowledge of all the sources of supply, the full scope of
the organization, [or] the complete manner in which it operates,"
and in any event, all of them were now incarcerated except S-1 (A.
231, ¶ 101).

### 2.    Appellant's Motion to Suppress

On July 6, 2008, appellant joined in the motion to suppress of
then co-defendant Willie Best, who argued that wiretap evidence
should be suppressed because the government's affidavits submitted
in support of the wiretap authorizations had failed to satisfy the
"necessity" requirement (A. 121-22, 244).  Specifically, appellant
argued that the government had not "exhausted" its investigative
alternatives and could have relied on controlled buys, seizures,
and surveillance to build its case (A. 122, 246).  Appellant also
argued that "material information was withheld from . . . Judge
Kollar-Kotelly" in the September 2005 affidavit because the
government did not disclose until the January 2006 affidavit that
it had at least six confidential informants, not three (A. 439,
441-42).

23

The government responded that making controlled buys from
appellant and Willie Best would not suffice to establish the full
nature and scope of the criminal enterprise in which they
participated, adding that "the affidavit of Agent Counts is replete
with details concerning why each traditional investigative
technique, either tried or potential, had either failed or was
likely to fail to uncover the full extent of the drug distribution
scheme" (A. 173-75). Further, except for S-1, whose limitations as
a controlled buyer were addressed in the affidavits, all of the
other confidential informants were incarcerated and thus not in a
position to make controlled buys (A. 174, 449-50).

### 3.    Appellant's Request For A Franks Hearing

Appellant also requested a Franks hearing, contending that the
government had demonstrated reckless disregard for the truth by not
disclosing in Agent Counts's January 27, 2006, affidavit certain
"material facts bearing on the credibility and reliability" of S-4
and S-6, whom appellant believed to be Frank Canaday, Jr., and
Grady Jefferson, respectively (A. 124-26). Agent Counts "implie[d]
without saying" that "S-4" [Canaday] was reliable, but police
reports revealed that, before pleading guilty to attempted murder
and PWID narcotics, Canaday had "fabricated a story attempting to
shift blame to anybody other than himself for the shooting" and
"actively solicited help" in an "attempt to obstruct justice" in

24

2002 (A. 123-24). Although the January 27, 2006, affidavit had
reported that Canaday had an "extensive criminal record," the
omission of his "history of obstructing justice by falsely accusing
others of offenses he committed" was "material" and created a
"false impression" that Canaday was reliable (A. 124).

Also, the January 27, 2006, wiretap affidavit had not
disclosed that Jefferson ("S-6") (1) had continued to use narcotics
after pleading guilty in 2002 to conspiracy to distribute crack
cocaine, and (2) was charged in 2002 with giving the police a false
name during a traffic stop and then failing to appear in court,
thereby rendering the affidavit "mislead[ing]" to the extent it
suggested that Jefferson was reliable (A. 124-25).

Appellant did not argue that, if information provided by
Canaday and Jefferson was treated as unreliable and redacted, the
January 27, 2006, affidavit failed to establish probable cause or
necessity for the wiretap.

The prosecution maintained that no Franks hearing was
warranted because appellant had not shown that the omissions were
material, let alone made intentionally or recklessly, and that even
assuming arguendo those factors were demonstrated, probable cause
and necessity were clearly established even if the information
relating to S-4 and S-6 was completely removed from the January
2006 affidavit (A. 167-88, 449). Assuming S-4 was Canaday, the

25

government acknowledged that it had not included the blame-shifting information due to an oversight (A. 166, 448). However, because the affidavit had disclosed that S-4 had an extensive criminal history, "there was plenty of impeaching information," and thus the approving court was not "led astray" as to S-4's reliability (A. 448). Further, there was other information corroborating S-4's allegations that Best had been involved in drug dealing and weapons trafficking (A. 166).

The prosecution confirmed S-6 was indeed Jefferson (A. 448) and did not dispute that he had been a drug user while on release pending sentencing following his 2002 conviction, but contended that Jefferson was not using drugs "during the specific time period involved in the controlled buys from Best" (A. 167). Jefferson had been tested for drugs while on release, and after he tested positive for drug use, he was returned to custody and made no further buys (A. 448). The government acknowledged that those facts should have been included in the affidavit, but argued that Jefferson's drug use was "immaterial" because he was not testing positive for narcotics at the time he made the controlled buys (A. 448). In any event, Jefferson's extensive criminal history had been reported in the affidavit and thus provided "all the necessary impeaching information that a judge would want to know before signing off" on the wiretap (A. 448). As to the charge of

26

providing a false name during a traffic stop, the government maintained that that unresolved matter did not undermine the probable cause establishing that Best was a drug dealer, a fact separately established by, <u>inter</u> <u>alia</u>, audio recordings of controlled buys made from him (A. 167-68).

### 4.    The District Court's Ruling

After hearing arguments at the September 9, 2008, pretrial conference, the district court found that "the affidavit by Agent Counts seems to include a lot of detail about why the wiretap was appropriate, including the limited amount of information that could be and had been gained through controlled buys, the limited success of pen registers, [and] that they couldn't learn much about the conspiracy just from tracking calls because the phones being used were registered to female family members and girlfriends" (A. 439). The court ruled:

> The motion to suppress the wiretap evidence . . . is an apt reminder to judges and prosecutors that wiretaps are not just to get more and to jazz up a case. They're used for necessity. It is my ruling that a showing of necessity in this case is adequate, and I will deny the motion to suppress the wiretap evidence, but note that the defendant has dropped a big issue in his error bag, and that the government might be careful about how much of this wiretap evidence it thinks it needs to use at the trial of this case.    (A. 453.)

27

The court did not make an explicit ruling on appellant's request

for a <u>Franks</u> hearing, and appellant did not press for one.

    C.   <u>Legal Analysis</u>

        1.   <u>The Wiretaps' Necessity</u>

Interception of wire communications is governed by Title III

of the Omnibus Crime Control and Safe Streets Act of 1968,

18 U.S.C. §§ 2510 <u>et</u> <u>seq</u>.  The statute mandates that the government

secure judicial authorization before electronic surveillance may

begin.  18 U.S.C. § 2516.  Before a wiretap is authorized, the

district court must find, <u>inter</u> <u>alia</u>, that the government has shown

that "normal investigative procedures have been tried and have

failed or reasonably appear to be unlikely to succeed if tried or

to be too dangerous."  18 U.S.C. § 2518(3)(c).  The necessity

requirement was "created . . . to ensure that 'wiretapping is not

resorted to in situations where traditional investigative

techniques would suffice to expose the crime."  <u>Carter</u>, 449 F.3d at

1293 (quoting <u>United States v. Kahn</u>, 415 U.S. 143, 155 n.12

(1974)).  However, to establish necessity, the government is "not

required to enumerate every technique or opportunity missed or

overlooked," <u>Sobamowo</u>, 892 F.2d at 93, or to "'unsuccessfully

attempt[]'" "'every other imaginable method of investigation.'"

<u>Carter</u>, 449 F.3d at 1293 (quoting <u>United States v. (George)</u>

<u>Williams</u>, 580 F.2d 578, 588 (D.C. Cir. 1978)); <u>see</u> <u>United States v.</u>

28

<u>Lopez</u>, 300 F.3d 46, 52 (1st Cir. 2002) ("the necessity requirement is not tantamount to an exhaustion requirement").   Rather, the government's burden is met "if it shows that 'other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation.'"   <u>Carter</u>, 449 F.3d at 1293 (quoting <u>(George)</u> <u>Williams</u>, 580 F.2d at 588).

Appellant argues that the district court erred because the government (1) already had "film and anectodal information from the three cooperators whom it had identified" in the September 2005 affidavit; (2) had made controlled buys, and "[n]othing really prevented further controlled buys" by other cooperators, including purchases by street-level dealers who could be arrested and "turn[ed]" into cooperators; (3) could have sought further search warrants and done additional video surveillance of coconspirators "operating fairly in the open" (Brief for Appellant at 44-45). Appellant also asserts that the government's explanations for why standard investigation techniques were unlikely to advance the investigation were "conclusory" and "could apply to any similar case" (<u>id.</u> at 45).   These arguments are without merit.

In <u>Carter</u> and <u>Sobamowo</u>, both narcotics conspiracy cases, the Court concluded that the necessity requirement was met by evidence outlined in affidavits establishing that a drug trafficking

29

operation existed, that the defendants were involved in the
operation, and that the government had tried to gather information
about the defendant in other ways.  Carter, 449 F.3d at 1293;
Sobamowo, 892 F.2d at 93. In Carter, the government tried building
its investigation using informants, but the defendant dealt only
with small circle of trusted confederates with whom he was already
familiar, and physical surveillance "would not generate detailed
information on the activities and associates [of the members of the
operation]."  449 F.3d at 1294.  Thus, the district court in Carter
did not abuse its discretion in finding wiretapping was necessary
to establish the full nature and scope of the conspiracy.  Id.
Likewise, in Sobamowo, the investigative methods the government
tried included contacting foreign sources and informants, checking
federal law enforcement agency records, and conducting physical
surveillance, but necessity was once again established because
those efforts did not and could not yield the full scope and nature
of the conspiracy.  892 F.2d at 93.

As in Carter and Sobamowo, Agent Count's affidavits set forth
in considerable detail the efforts made by the government to use
non-wiretap investigative techniques and the reasons why those
tools had not and would not succeed in revealing the full scope and
extent of the conspiracy here.  "'[A] court may authorize the
wiretap of the phone of a member of an operation if traditional

30

investigative techniques have proved inadequate to reveal the operation's full 'nature and scope.'"  Sobamowo, 892 F.2d at 93 (quoting United States v. Brown, 823 F.2d 591, 598 (D.C. Cir. 1987) (internal quotations omitted)).  Cooperators, all but one of whom were in prison, had limited access to top-level dealers and could not make controlled buys from them.  Even if they could have done so, such purchases would not have revealed the full scope of the operation.  See United States v. James, 494 F.2d 1007, 1016 (D.C. Cir. 1974) (individual narcotics purchases made directly from defendant "were only minor items in [his] enterprise," while "exposure of his entire operation required different and more sophisticated techniques," especially where "surveillance techniques and infiltration would be frustrated by [defendant's] extreme caution"); see also United States v. McGuire, 307 F.3d 1192, 1198-99 (9th Cir. 2002) ("The government's possession of evidence sufficient to indict some conspirators does not bar it from seeking evidence against others . . . .  [T]here was a powerful government interest in identifying all conspirators and the full scope of the conspiracy."); United States v. Plescia, 48 F.3d 1452, 1463 (7th Cir. 1995) (same).

        Necessity was also established because Willie Best and appellant had both been tipped off to search warrants in advance, and Best was said to have sources inside a grand jury and the D.C.

31

Jail informing him of investigations and potential witnesses. <u>See</u>
<u>United States v. (Salvatore) Williams</u>, 124 F.3d 411, 418 (3d Cir.
1997) (necessity requirement satisfied where use of informants was
thought too dangerous and conspirators regularly used evasive
techniques to avoid other kinds of law enforcement infiltration);
<u>United States v. Carrazana</u>, 921 F.2d 1557, 1564-65 (11th Cir. 1991)
(necessity existed where drug ring used counter-surveillance to
frustrate investigation); <u>United States v. Macklin</u>, 902 F.2d 1320,
1327 (8th Cir. 1990) (necessity found where affidavit disclosed
that normal methods, including physical surveillance, pen
registers, and confidential information had been tried and failed
to "disclose the scope of the conspiracy and all the persons
involved," and other tactics, including grand jury investigation
and undercover operations had been rejected as too dangerous).
From this record, it is evident that the district court did not
abuse its discretion by finding, as the issuing judge had, that
necessity was established for wiretaps.

    Appellant also argues that the government "withheld material
information" from the initial wiretap application because the
January 2006 affidavit revealed the existence of six cooperators,
whereas the first two affidavits had revealed only three, and if
the government had included this information in the initial
September 2005 affidavit, it "likely would have had an effect on

32

[the authorizing court's] initial decision to grant their
application" (Brief for Appellant at 45-46). However, it is not
surprising that the affidavits' descriptions of confidential
informants differed. The focus of the September 2005 affidavit was
the target of that wiretap, Fred Mercer, while the January 2006
affidavit's target was Willie Best (compare A. 277-86 with A. 199-
210). Information reported from S-4, S-5, and S-6 in the Best
wiretap affidavit focused on Best and did not even mention Mercer;
thus, it was not material to a request for a wiretap on Mercer (A.
208-10). In any event, it is undisputed that S-4, S-5, and S-6
were all incarcerated, and thus were in no position to make further
controlled buys no matter which affidavit they first appeared in
(A. 208-10, ¶¶ 51, 56, 58); accordingly, their omission was not
material to the necessity showing for the wiretaps.[19/] See Carter,
449 F.3d at 1294 (failure to disclose use of tracking device on
defendant's car was not material omission in wiretap affidavit
where physical surveillance was inadequate to establish nature and

---

[19/]    As discussed infra at pp. 24 - 26, there is no indication
that any omissions were deliberate or reckless. Accordingly,
because the FBI objectively reasonably relied on the district
court's authorization of the September 2005, and October 2005,
wiretaps, evidence obtained from those wiretaps should not be
suppressed. See Gaston, 357 F.3d at 80-81 (applying good-faith
exception to Fourth Amendment exclusionary rule established in
United States v. Leon, 468 U.S. 897, 922 (1984), in declining to
suppress evidence obtained with defective search warrant where
officers conducting search acted in "objectively reasonable
reliance" on warrant); see also A. 452 (citing Leon).

33

scope of drug conspiracy and omission did not undercut fact
government had engaged in adequate range of investigative endeavors
before seeking wiretap).

### 2.    The Franks Hearing Request

The district court did not rule on appellant's request for a
Franks hearing and appellant did not press for one; thus, that
claim is forfeited. See United States v. Brantley, 786 F.2d 1322,
1327 (7th Cir. 1986) (a defendant's "[f]ailure to obtain a ruling
upon a motion leaves nothing for review"); United States v.
Wagoner, 713 F.2d 1371, 1373 (8th Cir. 1983) (same).  Assuming,
arguendo, that this claim is preserved, appellant did not satisfy
any of the three factors necessary to trigger a Franks hearing.
The government acknowledged that the January 2006 affidavit should
have included certain detailed information about the criminal
histories of S-4 and S-6 (A. 448), but there is nothing in the
record to suggest the omissions were material, especially given the
disclosure that both had extensive criminal histories (A. 208,
¶ 52; A. 210, ¶ 59).

Further, there is nothing to indicate the omissions were
deliberate or even reckless.  An omission that is the result of
negligence or innocent mistake is not sufficient to trigger a
Franks hearing.    Franks, 438 U.S. at 171; see United States v.
Davis, 617 F.2d 677, 694 (D.C. Cir. 1979) (defendant must make

34

substantial showing that affiant deliberately falsified information
in warrant affidavit or "in fact entertained serious doubts as to
the truth" of information supporting it).  As the government
explained, the omissions were an oversight (A. 166, 448), and
appellant has not shown otherwise.

    Finally, appellant has not met his burden to show that the
omissions had any effect on the probable cause or necessity
findings.  Only seven of the 119 paragraphs in the January 2006
affidavit were devoted to information relayed by S-4 or S-6 (see A.
208-10, ¶¶ 51-55, 58-59).  Similar (and more detailed) information
had been reported and corroborated by the other three informants
(A. 199-208), among other sources.  See Illinois v. Gates, 462 U.S.
213, 244-45 (1983) ("It is enough, for purposes of assessing
probable cause, that corroboration through other sources of
information reduce[d] the chances of a reckless or prevaricating
tale, thus providing a substantial basis for crediting the
hearsay") (internal quotation marks and citation omitted).
Appellant has made no showing that necessity or probable cause
would be lacking if the information from S-4 and S-6 was not
considered (see Brief for Appellant at 54).[20/]  Absent that showing,

_____

    [20/]    Appellant suggests that "evidentiary allegations secured
from . . . the agent[']s continuously violating the necessity
threshold" should be "disregarded" and that information from S-5
was "plainly unacceptable stale information" (Brief for Appellant
                                                    (continued...)

35

his claim fails.  See Richardson, 861 F.2d at 294-295 (court need

not determine whether inaccuracy in search warrant affidavit was

material because, even if it met scienter requirement, there was no

showing that it met the "third prong of the Franks test").[21]

## II. The District Court Did Not Plainly Err By Admitting Evidence Of Appellant's Continued Participation In The Conspiracy During His 2003-2005 Incarceration

### A.  Standard of Review

Generally, the decision to admit evidence is reviewed only for

abuse of discretion.  United States v. Gaviria, 116 F.3d 1498, 1532

(D.C. Cir. 1997); see also United States v. Bowie, 232 F.3d 923,

926-933 (D.C. Cir. 2000) (applying abuse-of-discretion standard to

review of evidence admitted pursuant to Rules 403 and 404(b) of the

Federal Rules of Evidence).  However, where no objection is raised,

the decision to admit it is reviewed for plain error.  See Fed. R.

Crim. P. 52(b).  To prevail under the plain-error standard,

appellant must show: "(1) error, (2) that is plain, and (3) that

affect[s] substantial rights [ ] . . . [and] (4) the error

seriously affect[s] the fairness, integrity, or public reputation

_____

[20]/(...continued)
at 54).  There is no basis under Franks for disregarding
information not shown to be intentionally or recklessly false.

[21]/  Even assuming, arguendo, that the Court finds that the
district court erred by not holding a Franks hearing, the remedy is
not reversal, but rather a remand for a Franks hearing in the
district court.  See, e.g., United States v. Tate, 524 F.3d 449,
451 (4th Cir. 2008).

36

of judicial proceedings." United States v. Rawlings, 522 F.3d 403, 407 (D.C. Cir. 2008) (citing Johnson v. United States, 520 U.S. 461, 466-67 (1997), and United States v. Olano, 507 U.S. 725, 732-34 (1993) (internal quotation marks omitted)).

B.   Procedural Background

At a pretrial hearing on September 9, 2008, the prosecution advised that it planned to elicit testimony that, while incarcerated between 2003 and 2005, appellant acted in furtherance of the conspiracy by, inter alia, "dealing with multiple conspirators, at least two of whom are going to be testifying about either directing acts of drug distribution[;] . . . or people smuggling things [to appellant] while in jail so that he [could] keep himself sustained in terms of generating income for himself" (A. 457).[22] The government did not plan to ask why appellant was in prison at that time.[23] When defense counsel objected, the court

_____

[22] The government had previously notified the court and the defendants of its intent to seek admission of evidence intrinsic to the conspiracy, maintaining that this evidence "falls outside the requirements of Rule 404(b) as it is direct evidence of the conspiracy" (A. 88); see also A. 385-86, ¶ 6 (detailed proffer of evidence prosecution planned to elicit concerning appellant's continued participation in the conspiracy during his 2003-2005 incarceration).

[23] In 2003, appellant was held while awaiting trial in the shooting of Russell Harris (A. 578).  During appellant's trial in this case, the jury learned that appellant was acquitted in the Harris shooting, but did not learn that he remained in custody through the spring of 2005 because he was convicted for failure to
(continued...)

37

ruled:  "I'm going to have to hear this objection in the context of
the trial when I hear what's already in evidence and what's already
been proven.  But my instinct at this point is to allow this with
a limiting instruction, and I will look to the defense for an
appropriate limiting instruction . . . .  And I make that sort of
tentative ruling without prejudice to a defense objection made in
the context of the trial."  (A. 459-460.)

        In his opening statement, the prosecutor told the jury that
appellant "got locked up on a separate charge" in October 2003;
that appellant's "drug associates chipped in money for his lawyer";
and that, while in prison, appellant obtained a cell phone and was
"directing the distribution of drugs . . . [and] the distribution
of money" (A. 474).  In his opening, defense counsel stated that
appellant was not a drug "kingpin" immersed in conspiracy, but
rather "a guy who will maybe hustle some drugs . . . .  He gets
arrested, he gets out, he gets a job sometimes, he gets out.
That's what he is."  (A. 492).

        The next day, before testimony began, defense counsel renewed
his objection and asked that the government make another proffer as
to what the testimony would be (R.M. 4).  The government proffered
that Christian Donaldson and Russell Ramseur would testify that,

---

        [23]/(...continued)
appear in court in another case (see A. 385, 389, 397, 459).

38

while appellant was incarcerated, he was "directing drug distribution activities between and amongst other persons associated with the conspiracy" (R.M. 6). Specifically, Donaldson would testify that appellant asked her to obtain a cell phone and marijuana for him, which Donaldson did, and that appellant instructed Donaldson to obtain crack cocaine from Ramseur in order to sell it, which Donaldson also did, all while appellant was in jail (R.M. 6).

Appellant objected to evidence concerning delivery of marijuana to appellant on the ground that it was "for personal use" and thus not evidence of the charged conspiracy (R.M. 7). He also argued that the government already had "substantial evidence about drug dealing, and they don't need to extend this to the jail environment," and that the evidence was "far more inflammatory than it is probative" (R.M. 7). The court responded: "Well, that's basically a Rule 403 motion. I'll listen to the testimony as it comes in, and if I think it reaches that point, I'll intervene. But on the face of it, it doesn't seem to me like it's . . . intrinsically inflammatory" (R.M. 7-8).[24/] Appellant did not renew his objection at any point thereafter, including during or after

---

[24/]   The court also observed that "it would be a strange rule indeed that allowed both sides to refer to the fact that [appellant] was in prison, and then let the fact of the prison operate to obscure any criminal conduct that he engaged in while he was in prison" (R.M. 4-5).

39

the testimony from Donaldson or Ramseur. Appellant also did not request any limiting instruction on the use of this evidence (see A. 420), and the district court did not give one sua sponte.

On October 16, 2008, appellant filed a motion for a new trial in which he argued, inter alia, that the evidence of his activities while in prison was not "intrinsic to the furtherance of the charged conspiracy," that the district court had failed to "balance[] the evidence as required by FRE 404(b)" to exclude it, and that it was more prejudicial than probative (A. 388-92). The district court denied the motion, finding that "[t]he testimony about [appellant's] activities while incarcerated was relevant to the existence and/or continuing operation of the charged conspiracy and probative of [his] participation in it" (A. 421). Donaldson's testimony "establish[ed] that, even during his incarceration, [appellant] exerted significant influence and control over the drug sales business at the second court [on Fourth Street]" (A. 421). "Ramseur also explained that giving heroin and cocaine to Donaldson to take to [appellant] acted as an important starting point for a long-term drug dealing relationship between him and [appellant], and also that [appellant] used a cell phone to contact him from jail" (A. 421). The trial court concluded: "[t]his was not Rule 404(b) evidence; it was evidence intrinsic of the conspiracy" (A. 421).

40

The trial court further found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice (A. 422, citing Fed. R. Evid. 403).[25/]  "Moreover, both the prosecution and the defense mentioned, without objection, that [appellant] had at some point been incarcerated" (A. 422).

    C.  <u>Legal Analysis</u>

Despite the district court's repeated invitations to the defense to renew its objections to the admission of the challenged evidence during the trial, at which time the trial court would make a final ruling, and to draft a limiting instruction, the defense did not do so (A. 459-60; R.M. 7-8).  Therefore, the district court's decision to admit this evidence is subject to review for only for plain error, not abuse of discretion.  Fed. R. Evid. 103(a), (d).  Appellant cannot show the district court abused its discretion, let alone committed plain error.

If evidence "is of an act that is part of the charged offense, it is properly considered intrinsic," and is therefore not subject to analysis under Rule 404(b) of the Federal Rules of Evidence.[26/]

_____

    [25/]  Fed. R. Evid. 403 provides, <u>inter</u> <u>alia</u>, that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice . . . ."

    [26/]  Fed. R. Evid. 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive,
                                      (continued...)

41

Bowie, 232 F.3d at 929.[27] Evidence that is probative of a charged conspiracy is admissible as "direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused." 22 C. Wright & K. Graham, Jr., Federal Practice and Procedure § 5239 (1978), p. 450; see United States v. Haire, 371 F.3d 833, 841 (D.C. Cir. 2004) (evidence of acts connected with narcotics distribution conspiracy is "not 404(b) evidence at all"), vacated on other grounds, ; see also United States v. Alexander, 331 F.3d 116, 126 n.13 (D.C. Cir. 2003) (if act is part of charged crime, "evidence of it will, by definition, always satisfy Rule 404(b)"). Further, "some uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime." Bowie, 232 F.3d at 929; see United States v. Badru, 97 F.3d 1471, 1473-1475 (D.C. Cir. 1996) (upholding admission of evidence of method of narcotics supply as intrinsic evidence in charged drug distribution conspiracy); see also United States v. Thai, 29 F.3d

_____

[26]/(...continued)
opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."

[27]/    Appellant cites Bowie for the proposition that direct or intrinsic evidence is admitted only under "narrow" circumstances (Brief for Appellant at 57).  The Court in Bowie stated that "evidence can be 'intrinsic to' the charged crime" "in a narrow range of circumstances not implicated here."  232 F.3d at 929. Significantly, Bowie did not involve a conspiracy charge.

42

785, 812 (2d Cir. 1994) (evidence of uncharged crimes such as robbery, assault and extortion admitted in RICO trial was not Rule 404(b) evidence because these crimes were independently admissible as committed in furtherance of RICO conspiracy); United States v. Williford, 764 F.2d 1493, 1498 (11th Cir. 1985) (evidence of uncharged offense arising from same series of transactions as that charged not extrinsic offense within meaning of Rule 404(b)).

Here, the superceding indictment charged a conspiracy to distribute and possession with intent to distribute cocaine base (crack cocaine), cocaine powder, and cannabis from 1995 through May 2007 in the District of Columbia, Virginia, Maryland, "and elsewhere," including North Carolina, achieved by, among other things, the use of cell phones (A. 30-33). Evidence adduced at trial established that, during his incarceration in 2003-2005, appellant (1) "still had the ability" to control crack cocaine sales on Fourth Street (R.M. 38); (2) arranged for Christine Donaldson to obtain crack cocaine from Russell Ramseur and Fred Mercer so that she could sell it on Fourth Street (R.M. 19-20, 38, 41-43, 101; A. 531-32); (3) asked Donaldson to "bring him some coke" in prison, which Ramseur supplied (R.M. 36, 38, 111-13); (5) instructed Ramseur to supply Donaldson with heroin to deliver to appellant so that appellant could resell it in prison for ten times its street value (R.M. 36, 38-40 112-13); (6) arranged for

43

Sampler to supply Donaldson with marijuana for delivery to appellant (R.M. 15-16, 41); (7) successfully coordinated Donaldson's smuggling of a cell phone into the prison via a guard (R.M. 40-41); and (8) directed Gina Taylor to raise money from various suppliers and dealers to help pay appellant's legal fees incurred to defend himself in the shooting of a rival drug dealer (A. 642, 647-48). This was direct evidence of appellant's continuing participation in the charged conspiracy, as it showed his continuing leadership of the conspiracy, his association with the same dealers and suppliers, their roles in the conspiracy, the use of a cell phone to obtain drugs, and the supply and distribution of narcotics.

Appellant contends that evidence of his drug dealing while incarcerated "was not undertaken in furtherance of the conspiracy" because it did not relate to "the core theory" that the conspiracy was "a family-based open air drug market . . . at 4th and Livingston" (Brief for Appellant at 60). But the indictment was not so narrowly drawn, for it alleged the conspiracy operated in the District of Columbia, Virginia, Maryland, and North Carolina, among other places (A. 30, 33).

Appellant also asserts that Donaldson's delivery of marijuana and heroin from Sampler and Ramseur did not further the cocaine distribute conspiracy because these "sporadic arrangement[s]"

44

merely involved "small quantities of contraband [provided by appellant] on the sly to his fellow inmates when the opportunity arose" (Brief for Appellant at 60).  First, the indictment specifically included marijuana as one of the drugs implicated in the conspiracy (see A. 31, ¶ 3).  Second, appellant's use of the same coconspirators to supply him with drugs to sell in prison – at ten times street value – demonstrated the continued leadership by which he maintained control over the narcotics distribution pyramid, which was particularly evident from the fact that Ramseur did not provide drugs to Donaldson without first ensuring that they were for delivery to appellant (R.M. 39-40, 112-13).[28/]  This was all direct evidence of the conspiracy, even if it also involved heroin as well as cocaine and marijuana.  See United States v. Brugman, 655 F.2d 540, 544-45 (4th Cir. 1981) (upholding, as direct evidence in charged conspiracy to distribute cocaine, or alternatively, under Rule 404(b), the admission of evidence of sale of hashish and marijuana involving same coconspirators).  Appellant

---

[28/]  Appellant suggests that Donaldson stayed in touch with appellant during his incarceration merely because "it was in her economic interest" to do so and that "her helping deliver Ramseur's drugs and a cell phone to [appellant] were not shown to have furthered the objectives . . . of the family-operated drug market at 4th and Livingston" (Brief for Appellant at 60).  Here, appellant simply ignores Donaldson's testimony that appellant was "still telling [Donaldson] where to get the work from" on Fourth Street and still "had the ability" to control who was allowed to sell crack there (R.M. 19-20, 38, 41-43; A. 531-32).

45

has not demonstrated that the district court erred, plainly or otherwise, in admitting this evidence.

Appellant argues that evidence of Ramseur's "occasional transactions" with appellant in prison "did not advance the goals of the 4th and Livingston sales operation" (Brief for Appellant at 60). However, Ramseur testified that their relationship became "stronger" after appellant's incarceration and that the two began supplying each other with large quantities of cocaine after appellant's release (A. 713, R.M. 114-159, 131). It is a reasonable inference that Ramseur's willingness to supply the drugs carried to appellant by Donaldson served the conspiracy by solidifying that association.

Even assuming, arguendo, that the district court erred by admitting evidence of appellant's activities while incarcerated as direct evidence of the conspiracy, the evidence was alternatively admissible under Rule 404(b) as evidence of intent, plan, preparation, and motive, especially when combined with evidence of appellant's continued leadership of the conspiracy upon his release in 2005. "In a conspiracy prosecution, the government is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in

46

the crime developed.'" United States v. Mathis, 216 F.3d 18, 26

(D.C. Cir. 2000) (quoting United States v. (Zolton) Williams, 205

F.3d 23, 33-34 (2d Cir. 2000)); accord United States v. Sampol, 636

F.2d 621, 659 n.23 (D.C. Cir. 1980) (evidence tending to

demonstrate "intent, plan, preparation, and motive . . . is

particularly probative where the government has alleged

conspiracy"). See also United States v. Hines, 717 F.2d 1481, 1489

(4th Cir. 1983) (upholding, under Rule 404(b), admission of

"limited references to marijuana dealings in order to show intent

concerning the cocaine dealings" in cocaine conspiracy case).[29]/

The district court also did not plainly err by admitting the

challenged evidence under Fed. R. Evid. 403 because its probative

value was not substantially outweighed by unfair prejudice. See,

e.g., United States v. Champion, 813 F.2d 1154, 1172-73 (11th Cir.

1987) (upholding admission of evidence defendant placed phone calls

---

[29]/ Appellant's failure to request a limiting instruction (A.
420) is fatal to any claim that Rule 404(b) evidence was admitted
in error. See Fed. R. Evid. 105 ("[w]hen evidence is admissible .
. . for one purpose but not admissible as to another . . . , the
court, *upon request*, shall restrict the evidence to its proper
scope and instruct the jury accordingly") (emphasis added)).
Unless trial counsel requests a limiting instruction, a district
court will not be reversed for failing to give one sua sponte.
United States v. Rhodes, 62 F.3d 1449, 1454-55 (D.C. Cir. 1995),
vacated on other grounds, 517 U.S. 1164 (1996); see also United
States v. Ruffin, 40 F.3d 1296, 1298-99 (D.C. Cir. 1994) (if court
conditionally admits Rule 404(b) evidence, and conditions are not
satisfied, burden rests on opposing party to renew objection; court
need not strike evidence and instruct jury sua sponte).

47

to coconspirators regarding drug shipments while in prison during
part of time frame covered by charged drug distribution conspiracy,
(1) finding "we need not engage in a Rule 404(b) analysis" to admit
such direct evidence of conspiracy; (2) rejecting argument that
probative value was substantially outweighed by unfair prejudice
and (3) in any event, "substantial independent evidence" of guilt
reduced likelihood challenged evidence had substantial impact on
verdict).

Finally, even if the district court erred by admitting the
evidence, appellant cannot meet his burden to show that it
affected his substantial rights and seriously affected the
fairness, integrity, or public reputation of the proceedings. See
Rawlings, 522 F.3d at 407 (citing Olano, 507 U.S. at 732-34). Even
without reference to appellant's activities while imprisoned, the
evidence overwhelmingly established that appellant helped run a
conspiracy involving the distribution and sale of crack cocaine by
regularly obtaining large quantities (up to a full kilo) of cocaine
from other dealers; stowing drugs, cash, guns, and pit bulls at
apartments on Fourth Street; routinely manufacturing powder cocaine
into crack cocaine; training dealers how to break "eight-balls" of
crack into smaller quantities for individual sale; creating an
enforced "rotation" of when and which dealers in appellant's
"program" could make sales; abusing "crackheads" who did not follow

48

his sales instructions; and stealing from rival dealers, shooting them, or turning pit bulls loose on them (A. 507-09, 512, 514, 534-36, 570-71, 573-74, 594, 596-97, 642-48, 652-56, 660, 713; R.M. 14, 16-18, 21, 24-26, 27-32, 44-47, 56, 64-74, 113-16, 131). <u>See</u> <u>Gaviria</u>, 116 F.3d at 1532 (where district court admitted evidence of heroin dealing among coconspirators to a charged cocaine distribution conspiracy as intrinsic evidence of conspiracy and to show coconspirator relationships, ruling upheld under Rule 404(b) on ground, <u>inter</u> <u>alia</u>, that such evidence linked same coconspirators even though other evidence did also, and in any event, any prejudice from admission of heroin dealing in cocaine conspiracy was "slight").[30]/

III. Appellant Did Not Suffer Substantial Prejudice From The Prosecutor's Brief Rebuttal Reference To Appellant's 1995-1999 Incarceration

    A.   <u>Procedural Background</u>

        1.   <u>Appellant's Motion In Limine</u>

Before trial, appellant moved in limine to suppress evidence of his incarceration between 1995 and 1999, rejecting a prosecution proposal that appellant's absence from the scene at that time be

---

    [30]/  For the same reasons, even if appellant's claim is treated as preserved, the error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>See</u> <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946).

49

explained by suggesting he was merely "away" (A. 379).[31]    The
prosecution clarified that "the United States does not anticipate
eliciting from any witness the fact that [appellant] was
incarcerated during most of the period of 1995 to 1999, or the
basis for such incarceration. (At most, a witness may testify that
[appellant] was 'not around' for a certain period of time.)"  (A.
385).

At a September 9, 2008, pretrial hearing, the government
represented that "[t]here is not going to be a whole lot of
reference to [the 1995-1999 time frame] in the sense that we're not
putting on evidence or seeking to put on evidence that [appellant]
was dealing with anyone while incarcerated or furthering the
conspiracy" during that time (A. 456).  When the court inquired,
"Why . . . say anything about [appellant] if he wasn't around?,"
the prosecutor responded: "we're not going to ask anything about
him if he wasn't around," and continued: "but if asked by a defense
lawyer with not quite the surgical precision of [appellant's
counsel] -- " (A. 456-57).  The court interjected: "[a]ll right"
(A. 457).

## 2.    The Closing Arguments

---

[31]/    Appellant maintained that any such "euphemism to explain
that absence and sanitize such information" "would hardly fool the
jury" (A. 379).

50

As anticipated, evidence adduced at trial did not touch directly on appellant's activities between 1995 and 1999, and no mention was made of his incarceration during that time; thus, the prosecutor's closing argument did not address those matters.  In his closing argument, appellant's trial counsel told the jury: "In our system we don't try someone for being a robber, we try them for robbing someone *on a specific date*.  We don't try someone for being a drug dealer, we charge them for selling drugs . . . *on a particular date*."  (A. 745) (emphasis added).  Shortly thereafter, he argued:  "The government has charged [in the superceding indictment] that the conspiracy started in 1995.  1995 through 2007, 12 years.  Does anyone in this jury . . . recall any evidence whatsoever of what happened in the [Fourth Street] courts between 1995 and 2001?"  (A. 751.)

Before beginning his rebuttal, the prosecutor approached the bench and moved to strike defense counsel's remarks concerning the absence of evidence between 1995 and 2001 or, in the alternative, sought the court's permission to argue that

> [appellant] was incarcerated from mid-1995
> until 1999. [Defense counsel] moved in limine
> before the trial started to preclude reference
> to that, and he prevailed, and there was no
> reference to it.  But now he's stood up and
> argued an absence of evidence about that time
> period as a reason to acquit [appellant], when
> the reason there was an absence of evidence

51

> about where his client was was because he
> prevailed in getting it excluded.   (A. 762.)

Overruling a defense objection, the court ruled that "you can say

that [defense counsel] says there is no conspiracy activity between

1995 and 2001, and I'm here to advise you that [appellant] was

incarcerated between 1995 and 1999" (A. 763).[32/]

        In rebuttal, the prosecutor noted there was evidence that

"these defendants, members of this conspiracy, were involved in the

drug trade back in 1995 and before" (A. 776).  He added:

> But here's the thing, and this is what,
> with all due respect, [defense counsel]
> distorted.   This is the law that Judge
> Robertson is going to instruct you on: It is
> not essential that the government prove that
> the conspiracy began or ended on the specific
> dates set forth in the indictment, or that it
> was in existence for any particular length of
> time.   The '95 to 2007 time period, folks,
> what do you do with that?   You ask yourself
> from point A to point B, from '95 to '07, at
> some point between those dates did a
> conspiracy exist.     And if it did, was
> [appellant] a part of it, was Chris Becton a
> part of it?   That's the law.
>
> And I'll tell you something else.
> Because [defense counsel] argued to you an
> absence of evidence about the conspiracy in
> 1995 up through 2001, when Christian Donaldson
> moves into the second court.   It is a fact,
> ladies and gentlemen, that [appellant] was not
> on the street from about midway through 1995
> until sometime towards the end of 1999.   He

_____

        [32/]   Defense counsel declined to stipulate to appellant's
incarceration (A. 763).

52

was not on the street.  That is a fact.  He
was incarcerated.  (A. 777.)

The next day, while the jury deliberated, the prosecution
sought to re-open the record to put into evidence a judgment and
conviction order and a Bureau of Prisons record establishing that
appellant was in prison from January 30, 1995 until January 28,
1999 (R.M. 155-56).  Alternatively, the government asked the court
to take judicial notice of that incarceration (R.M. 156).  The
district court denied those requests, stating that "I don't think
the jury needs to know why [from the judgment and commitment order]
[appellant] was in prison," and adding that, "the only purpose for
allowing [the prosecution] to make that point during closing was to
rebut the argument that [appellant's counsel] arguably had made,
that there was no activity on 4th Street during that time" (R.M.
157).

### 3.   Appellant's Motion for a New Trial

Appellant moved for a new trial on the ground, inter alia,
that permitting the prosecution to refer to his 1995-1999
incarceration in rebuttal argument was error (A. 390, 392).  The
district court denied appellant's motion, finding that "[t]he
prosecution was true to its word [about not alluding at trial to
appellant's absence during his 1995-1999 incarceration], but,
during closing arguments, [appellant's] counsel made several

53

statements about the absence of evidence during that time period"
(A. 422-23) (citing 9/24/08 Tr. 1077 [A. 751]).  Nevertheless, the
court found that it "should not have allowed the prosecution to
make the contested statement in rebuttal because it was unsupported
by record evidence" (A. 425).  However, that error was harmless
"[g]iven the context of the rebuttal as a whole" and "because the
prosecution did not mention why [appellant] was incarcerated or
where, and the jury had already properly heard that [appellant] had
remained involved in the conspiracy during his 2003-2005 time in
jail" (A. 425-26).

        The court further found that "this was not a close case; the
evidence against [appellant] was unambiguous and overwhelming"
(A. 426).    Further, "the prosecution's evidence and argument
focused almost exclusively on events that occurred after he was
released" from his 1995-1999 incarceration (A. 426).  Thus, "[t]he
error was 'a single misstatement confined to a closing argument'
. . . [made] just after the prosecution rightly informed the jury
that the government need not prove the conspiracy began or ended on
the dates set forth in the indictment, or that it lasted for any
particular length of time" (A. 426, quoting United States v.
Gartmon, 146 F.3d 1015, 1026 (D.C. Cir. 1998)).

        Finally, the jury was also instructed that (1) the government
need not prove that the conspiracy began or ended on the specific

54

dates set forth in the indictment, or that it was in existence for any particular length of time, and that (2) the statements of lawyers are not evidence (A. 426-27, & n.5). The court added that the verdict suggested the jury had followed its instructions because it had determined that appellant was responsible for a conspiracy to distribute and PWID five hundred grams, but not five kilograms, of powder cocaine, and had not simply convicted appellant on all of the charged telephone counts (A. 427).

B.    Standard of Review and Applicable Legal Principles

"[A]n error in a prosecutor's summation will only rarely warrant reversal of a conviction." United States v. Donato, 99 F.3d 426, 432 (D.C. Cir. 1996). In assessing a claim that a prosecutor made an improper argument to the jury in closing argument, this Court determines whether the defendant suffered "substantial prejudice" by examining (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the error. Gartmon, 146 F.3d at 1026 (citing Gaither v. United States, 413 F.2d 1061, 1079 (D.C. Cir. 1969)). In weighing those factors, this Court "owes deference to the district court's assessment of [an improper] statement's prejudicial impact on the jury." United States v. Childress, 58 F.3d 693, 716 (D.C. Cir. 1995).

C.    Legal Analysis

55

"[I]n closing argument counsel may not refer to, or rely upon, evidence unless the trial court has admitted it." United States v. Maddox, 156 F.3d 1280, 1282 (D.C. Cir. 1998) (citations omitted); see United States v. Watson, 171 F.3d 695, 699 (D.C. Cir. 1999) (same). Here, because the district court declined to allow the prosecution to re-open the record to admit evidence of appellant's 1995-1999 incarceration, permitting the prosecution to refer to that fact in rebuttal was error. However, as the district court found, appellant did not suffer substantial prejudice from the prosecutor's brief reference to this earlier period of incarceration. Thus, the error was harmless, and does not warrant reversal.

First, as the district court found, the evidence of appellant's participation in the charged conspiracy was "unambiguous and overwhelming" (A. 426). Appellant maintains that "the evidence wasn't entirely one-sided" because the government "never seized any narcotics from [appellant]"; appellant "led somewhat of a hardscrabble existence prior to his [2003] imprisonment"; and "the prosecution's case substantially depended on the testimony of cooperators" with plea agreements (Brief for Appellant at 63). While the evidence at trial did not show that narcotics were recovered directly from appellant's person, narcotics provided by appellant were recovered from the homes of

56

girlfriends with whom he lived or regularly associated (see p. 4 n.
4 and p.p. 8-9 n. 13, supra).   Appellant provides no record
citation for his claim he suffered a "hardscrabble existence," but
in any event, this was not a close case.  Appellant's participation
in the conspiracy was established not only by numerous witnesses,
but also by intercepted conversations in which the jury heard
appellant himself repeatedly directing the supply and distribution
of narcotics.   As discussed supra at p. 48, the evidence firmly
established that appellant conspired to distribute and possess with
intent to distribute cocaine, cocaine base, and marijuana.

     Second, in context, the prosecutor's reference to appellant's
1995-1999  incarceration  was  not  "central[]  to  the  issue"  of
appellant's guilt because, as the prosecutor correctly noted, and
as the jury instructions made clear, it was not necessary to prove
that  appellant  participated  in  the  conspiracy  during  that
particular period of time in order to determine whether he was
guilty of the charged conspiracy.  The Supreme Court has cautioned
that challenged statements by counsel must be "viewed in context,"
United States v. Young, 470 U.S. 1, 11 (1985), and that reversal of
a conviction cannot easily be based on "[i]solated passages of a
prosecutor's argument, billed in advance to the jury as a matter of
opinion not of evidence," Donnelly v. DeChristoforo, 416 U.S. 637,
646-47 (1974).   In this case, a single reference to an earlier

57

period of incarceration did not create substantial prejudice when placed in context. Appellant maintains that the reference meant he "was also tried for an uncharged conviction" (Brief for Appellant at 63), but the jury had already been told in defense counsel's opening statement that appellant was "a guy who will maybe hustle some drugs . . . . He gets arrested, he gets out, he gets a job sometimes, he gets out. That's what he is." (A. 492). Accordingly, the fact that there was more than one period of incarceration in appellant's past had already been revealed by defense counsel. Given defense counsel's argument and the evidence of the conspiracy adduced at trial, including appellant's participation in the conspiracy from inside prison during 2003-2005, it is hard to see how appellant was prejudiced, let alone substantially prejudiced, by one additional brief allusion to a previous incarceration. Appellant has shown no reason why the Court should not defer to the district court's finding that appellant was not prejudiced.

Third, as the district court noted, the impact of any error was mitigated because the jury was instructed that the arguments and statements of lawyers were not evidence (see A. 426-27). Jury instructions "can mitigate the impact of erroneous jury argument." Gartmon, 146 F.3d at 1026. Appellant suggests it is "questionable" that the jury was "sophisticated enough to disregard improperly

58

admitted evidence of bad character" (Brief for Appellant at 64).
However, juries are presumed to follow their instructions. United
States v. Roy, 473 F.3d 1232, 1238 (D.C. Cir. 2007).  Further,
appellant's earlier incarceration was not argued as evidence of
appellant's character; it was offered to rebut a misleading legal
argument from the defense.  This Court is "especially chary of
finding the prosecutor's statements unduly prejudicial when much of
the objectionable comment was invited by or was responsive to the
opening summation of the defense." United States v. Burnett, 890
F.2d 1233, 1242 (D.C. Cir. 1989).  Instead, considering the context
in which the prosecutor's remark was made, it is particularly
appropriate here to apply the "presump[tion] that a jury acts with
common sense and discrimination when confronted with an improper
remark from a prosecutor . . . ." Childress, 58 F.3d at 716
(internal quotation omitted). See also DeChristoforo, 416 U.S. at
647 ("a court should not lightly infer that a prosecutor intends an
ambiguous remark to have its most damaging meaning or that a jury,
sitting through a lengthy exhortation, will draw that meaning from
the plethora of less damaging interpretations.").

Finally, the challenged remark also came only after the
prosecutor told the jury that it was not necessary to find that
appellant participated in the conspiracy in every year charged, a
point the district court found was "reinforced" by the jury

59

instructions (A. 426 n.5).  Given the overwhelming evidence of appellant's guilt, the context in which the comment was made, and the instructions given, this Court "can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'"  Gaither, 314 F.2d at 1079 (quoting Kotteakos, 328 U.S. at 765).

60

### CONCLUSION

WHEREFORE, appellee respectfully requests that the judgment of the district court be affirmed.

Respectfully submitted,


CHANNING D. PHILLIPS,
Acting United States Attorney.

ROY W. McLEESE III,
JOHN P. MANNARINO,
ARVIND K. LAL,
MATTHEW P. COHEN,
Assistant United States Attorneys.


<u>            /s/            </u>
SUZANNE C. NYLAND, DC BAR #375998
Assistant United States Attorney
555 Fourth Street, NW, Room 8104
Washington, D.C.  20530
(202) 514-7088

## CERTIFICATE OF WORD COUNT

I HEREBY CERTIFY that this brief conforms to the word limit imposed by Fed. R. App. P. 32(a)(7)(B) and contains 13,702 words and that it is filed in Courier, a monospace font.

_____/s/_____
SUZANNE C. NYLAND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing to be served by electronic means, through the Court's CM/ECF system, upon:

Stephen C. Leckar
Shainis & Peltzman Cht'd.
Suite 240
1850 M Street, N.W.
Washington, D.C. 20036
Steve@s-plaw.com
Counsel for Appellant

_____/s/_____
SUZANNE C. NYLAND
Assistant United States Attorney

# ADDENDUM

I N D E X

PAGE

ADDENDUM

18 U.S.C. § 2518. . . . . . . . . . . . . . . . . . . . . . . . A-1

21 U.S.C. § 843(b)  . . . . . . . . . . . . . . . . . . . . . . A-8

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . A-12

Westlaw.

C

**Effective: October 20, 1998**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 119. Wire and Electronic Communications Interception and Interception of Oral Communications (Refs & Annos)
        → **§ 2518. Procedure for interception of wire, oral, or electronic communications**

**(1)** Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

**(a)** the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

**(b)** a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

**(c)** a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

**(d)** a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

**(e)** a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

A-2

**(f)** where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

**(2)** The judge may require the applicant to furnish additional testimony or documentary evidence in support of the application.

**(3)** Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that--

**(a)** there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

**(b)** there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

**(c)** normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

**(d)** except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

**(4)** Each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify--

**(a)** the identity of the person, if known, whose communications are to be intercepted;

**(b)** the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

**(c)** a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A-3**

(**d**) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

(**e**) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

An order authorizing the interception of a wire, oral, or electronic communication under this chapter shall, upon request of the applicant, direct that a provider of wire or electronic communication service, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such service provider, landlord, custodian, or person is according the person whose communications are to be intercepted. Any provider of wire or electronic communication service, landlord, custodian or other person furnishing such facilities or technical assistance shall be compensated therefor by the applicant for reasonable expenses incurred in providing such facilities or assistance. Pursuant to section 2522 of this chapter, an order may also be issued to enforce the assistance capability and capacity requirements under the Communications Assistance for Law Enforcement Act.

(**5**) No order entered under this section may authorize or approve the interception of any wire, oral, or electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Such thirty-day period begins on the earlier of the day on which the investigative or law enforcement officer first begins to conduct an interception under the order or ten days after the order is entered. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. An interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

(**6**) Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require.

(**7**) Notwithstanding any other provision of this chapter, any investigative or law enforcement officer, specially

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A-4**

designated by the Attorney General, the Deputy Attorney General, the Associate Attorney General, or by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State, who reasonably determines that--

  (a) an emergency situation exists that involves--

    (i) immediate danger of death or serious physical injury to any person,

    (ii) conspiratorial activities threatening the national security interest, or

    (iii) conspiratorial activities characteristic of organized crime,

    that requires a wire, oral, or electronic communication to be intercepted before an order authorizing such interception can, with due diligence, be obtained, and

  (b) there are grounds upon which an order could be entered under this chapter to authorize such interception,

may intercept such wire, oral, or electronic communication if an application for an order approving the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur. In the absence of an order, such interception shall immediately terminate when the communication sought is obtained or when the application for the order is denied, whichever is earlier. In the event such application for approval is denied, or in any other case where the interception is terminated without an order having been issued, the contents of any wire, oral, or electronic communication intercepted shall be treated as having been obtained in violation of this chapter, and an inventory shall be served as provided for in subsection (d) of this section on the person named in the application.

**(8) (a)** The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

A-5

(b) Applications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

(c) Any violation of the provisions of this subsection may be punished as contempt of the issuing or denying judge.

(d) Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518(7)(b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of--

   (1) the fact of the entry of the order or the application;

   (2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and

   (3) the fact that during the period wire, oral, or electronic communications were or were not intercepted.

The judge, upon the filing of a motion, may in his discretion make available to such person or his counsel for inspection such portions of the intercepted communications, applications and orders as the judge determines to be in the interest of justice. On an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed.

(9) The contents of any wire, oral, or electronic communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

(10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that--

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A-6**

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Such motion shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice.

(b) In addition to any other right to appeal, the United States shall have the right to appeal from an order granting a motion to suppress made under paragraph (a) of this subsection, or the denial of an application for an order of approval, if the United States attorney shall certify to the judge or other official granting such motion or denying such application that the appeal is not taken for purposes of delay. Such appeal shall be taken within thirty days after the date the order was entered and shall be diligently prosecuted.

(c) The remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications.

(11) The requirements of subsections (1)(b)(ii) and (3)(d) of this section relating to the specification of the facilities from which, or the place where, the communication is to be intercepted do not apply if--

(a) in the case of an application with respect to the interception of an oral communication--

(i) the application is by a Federal investigative or law enforcement officer and is approved by the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General, or an acting Assistant Attorney General;

(ii) the application contains a full and complete statement as to why such specification is not practical and identifies the person committing the offense and whose communications are to be intercepted; and

(iii) the judge finds that such specification is not practical; and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 2518                                                                   Page 7

**A-7**

**(b)** in the case of an application with respect to a wire or electronic communication--

    **(i)** the application is by a Federal investigative or law enforcement officer and is approved by the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General, or acting Assistant Attorney General;

    **(ii)** the application identifies the person believed to be committing the offense and whose communications are to be intercepted and the applicant makes a showing that there is probable cause to believe that the person's actions could have the effect of thwarting interception from a specified facility;

    **(iii)** the judge finds that such showing has been adequately made; and

    **(iv)** the order authorizing or approving the interception is limited to interception only for such time as it is reasonable to presume that the person identified in the application is or was reasonably proximate to the instrument through which such communication will be or was transmitted.

**(12)** An interception of a communication under an order with respect to which the requirements of subsections (1)(b)(ii) and (3)(d) of this section do not apply by reason of subsection (11)(a) shall not begin until the place where the communication is to be intercepted is ascertained by the person implementing the interception order. A provider of wire or electronic communications service that has received an order as provided for in subsection (11)(b) may move the court to modify or quash the order on the ground that its assistance with respect to the interception cannot be performed in a timely or reasonable fashion. The court, upon notice to the government, shall decide such a motion expeditiously.

CREDIT(S)

(Added Pub.L. 90-351, Title III, § 802, June 19, 1968, 82 Stat. 218, and amended Pub.L. 91-358, Title II, § 211(b), July 29, 1970, 84 Stat. 654; Pub.L. 95-511, Title II, § 201(d) to (g), Oct. 25, 1978, 92 Stat. 1797, 1798; Pub.L. 98-473, Title II, § 1203(a), (b), Oct. 12, 1984, 98 Stat. 2152; Pub.L. 99-508, Title I, §§ 101(c)(1)(A), (8), (e), 106(a) to (d)(3), Oct. 21, 1986, 100 Stat. 1851-1853, 1856, 1857; Pub.L. 103-414, Title II, § 201(b)(1), Oct. 25, 1994, 108 Stat. 4290; Pub.L. 105-272, Title VI. § 604, Oct. 20, 1998, 112 Stat. 2413.)

Current through P.L. 111-49 approved 8-12-09

Westlaw. (C) 2009 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

21 U.S.C.A. § 843

A-8

Page 1

C

**Effective: April 15, 2009**

United States Code Annotated Currentness
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 13. Drug Abuse Prevention and Control (Refs & Annos)
      ▀ Subchapter I. Control and Enforcement
        ▀ Part D. Offenses and Penalties
          → **§ 843. Prohibited acts C**

(a) Unlawful acts

It shall be unlawful for any person knowingly or intentionally--

(1) who is a registrant to distribute a controlled substance classified in schedule I or II, in the course of his legitimate business, except pursuant to an order or an order form as required by section 828 of this title;

(2) to use in the course of the manufacture, distribution, or dispensing of a controlled substance, or to use for the purpose of acquiring or obtaining a controlled substance, a registration number which is fictitious, revoked, suspended, expired, or issued to another person;

(3) to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge;

(4) (A) to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this subchapter or subchapter II of this chapter, or (B) to present false or fraudulent identification where the person is receiving or purchasing a listed chemical and the person is required to present identification under section 830(a) of this title;

(5) to make, distribute, or possess any punch, die, plate, stone, or other thing designed to print, imprint, or reproduce the trademark, trade name, or other identifying mark, imprint, or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit substance;

(6) to possess any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or material which may be used to manufacture a controlled sub-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

A-9

stance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical in violation of this subchapter or subchapter II of this chapter;

**(7)** to manufacture, distribute, export, or import any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical in violation of this subchapter or subchapter II of this chapter or, in the case of an exportation, in violation of this subchapter or subchapter II of this chapter or of the laws of the country to which it is exported;

**(8)** to create a chemical mixture for the purpose of evading a requirement of section 830 of this title or to receive a chemical mixture created for that purpose; or

**(9)** to distribute, import, or export a list I chemical without the registration required by this subchapter or subchapter II of this chapter.

(b) Communication facility

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

**(c)(1)** It shall be unlawful for any person to place in any newspaper, magazine, handbill, or other publications, any written advertisement knowing that it has the purpose of seeking or offering illegally to receive, buy, or distribute a Schedule [FN1] I controlled substance. As used in this section the term "advertisement" includes, in addition to its ordinary meaning, such advertisements as those for a catalog of Schedule [FN1] I controlled substances and any similar written advertisement that has the purpose of seeking or offering illegally to receive, buy, or distribute a Schedule [FN1] I controlled substance. The term "advertisement" does not include material which merely advocates the use of a similar material, which advocates a position or practice, and does not attempt to propose or facilitate an actual transaction in a Schedule [FN1] I controlled substance.

**(2)(A)** It shall be unlawful for any person to knowingly or intentionally use the Internet, or cause the Internet to be used, to advertise the sale of, or to offer to sell, distribute, or dispense, a controlled substance where such sale, distribution, or dispensing is not authorized by this subchapter or by the Controlled Substances Import and Export Act.

## A-10

**(B)** Examples of activities that violate subparagraph (A) include, but are not limited to, knowingly or intentionally causing the placement on the Internet of an advertisement that refers to or directs prospective buyers to Internet sellers of controlled substances who are not registered with a modification under section 823(f) of this title.

**(C)** Subparagraph (A) does not apply to material that either--

**(i)** merely advertises the distribution of controlled substances by nonpractitioners to the extent authorized by their registration under this subchapter; or

**(ii)** merely advocates the use of a controlled substance or includes pricing information without attempting to facilitate an actual transaction involving a controlled substance.

(d) Penalties

**(1)** Except as provided in paragraph (2), any person who violates this section shall be sentenced to a term of imprisonment of not more than 4 years, a fine under Title 18, or both; except that if any person commits such a violation after one or more prior convictions of him for violation of this section, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 8 years, a fine under Title 18, or both.

**(2)** Any person who, with the intent to manufacture or to facilitate the manufacture of methamphetamine, violates paragraph (6) or (7) of subsection (a) of this section, shall be sentenced to a term of imprisonment of not more than 10 years, a fine under Title 18, or both; except that if any person commits such a violation after one or more prior convictions of that person--

**(A)** for a violation of paragraph (6) or (7) of subsection (a) of this section;

**(B)** for a felony under any other provision of this subchapter or subchapter II of this chapter; or

**(C)** under any other law of the United States or any State relating to controlled substances or listed chemicals,

has become final, such person shall be sentenced to a term of imprisonment of not more than 20 years, a fine under Title 18, or both.

(e) Additional penalties

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A-11**

In addition to any other applicable penalty, any person convicted of a felony violation of this section relating to the receipt, distribution, manufacture, exportation, or importation of a listed chemical may be enjoined from engaging in any transaction involving a listed chemical for not more than ten years.

(f) Injunctions

**(1)** In addition to any penalty provided in this section, the Attorney General is authorized to commence a civil action for appropriate declaratory or injunctive relief relating to violations of this section, section 842, or 856 [FN2] of this title.

**(2)** Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business.

**(3)** Any order or judgment issued by the court pursuant to this subsection shall be tailored to restrain violations of this section or section 842 of this title.

**(4)** The court shall proceed as soon as practicable to the hearing and determination of such an action. An action under this subsection is governed by the Federal Rules of Civil Procedure except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

CREDIT(S)

(Pub.L. 91-513, Title II, § 403, Oct. 27, 1970, 84 Stat. 1263; Pub.L. 95-633, Title II, § 202(b)(3), Nov. 10, 1978, 92 Stat. 3776; Pub.L. 98-473, Title II, § 516, Oct. 12, 1984, 98 Stat. 2074; Pub. L. 99-570, Title I, § 1866(a), Oct. 27, 1986, 100 Stat. 3207-54; Pub.L. 100-690, Title VI, § 6057, Nov. 18, 1988, 102 Stat. 4319; Pub.L. 103-200, § 3(g), Dec. 17, 1993, 107 Stat. 2337; Pub.L. 103-322, Title IX, § 90106, Sept. 13, 1994, 108 Stat. 1988; Pub.L. 104-237, Title II, §§ 203(a), 206(b), Oct. 3, 1996, 110 Stat. 3102, 3103; Pub.L. 107-273, Div. B, Title IV, § 4002(d)(2)(C), Nov. 2, 2002, 116 Stat. 1810; Pub.L. 108-21, Title VI, § 608(d), Apr. 30, 2003, 117 Stat. 691; Pub.L. 110-425, § 3(g), Oct. 15, 2008, 122 Stat. 4830.)

[FN1] So in original. Probably should not be capitalized.

[FN2] So in original. Probably should be preceded by "section".

Current through P.L. 111-49 approved 8-12-09

Westlaw. (C) 2009 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

21 U.S.C.A. § 846                                A-12                                    Page 1

C

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
    Title 21. Food and Drugs (Refs & Annos)
        Chapter 13. Drug Abuse Prevention and Control (Refs & Annos)
            ⌐▣ Subchapter I. Control and Enforcement
                ⌐▣ Part D. Offenses and Penalties
                    → **§ 846. Attempt and conspiracy**

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the
same penalties as those prescribed for the offense, the commission of which was the object of the attempt or
conspiracy.


CREDIT(S)

(Pub.L. 91-513, Title II, § 406, Oct. 27, 1970, 84 Stat. 1265; Pub.L. 100-690, Title VI, § 6470(a), Nov. 18, 1988,
102 Stat. 4377.)


Current through P.L. 111-49 approved 8-12-09

Westlaw. (C) 2009 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT


© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.